

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00333-CV

———————————————————

MICHAEL FASEL, AS NEXT FRIEND AND PARENT OF B.F., A MINOR
CHILD, Appellant

V.

AIRBORNE SPORTS NRH, LLC D/B/A AIRBORNE SPORTS AND WILLIAMS
ENTERTAINMENT GROUP, LLC, D/B/A LEWISVILLE FUN, AIRBORNE
SPORTS, LLC, AIRBORNE LEWISVILLE, GOLDEN AXE LEWISVILLE, AND
LABYRINTH LEWISVILLE, Appellees

---

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-339201-22

---

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

In this premises-liability case, Appellant Michael Fasel, as next friend and parent of his daughter B.F., a minor child, appeals the trial court's order granting summary judgment in favor of Appellees Airborne Sports NRH, LLC d/b/a Airborne Sports and Williams Entertainment Group, LLC d/b/a Lewisville Fun, Airborne Sports, LLC, Airborne Lewisville, Golden Axe Lewisville, and Labyrinth Lewisville.[1] Because Fasel offered no evidence to support his claim that a protruding bolt on Airborne Sports' premises created an unreasonable risk of harm to B.F., we will affirm.

## I. Background

On January 10, 2021, Fasel took his seven-year-old daughter B.F. and her sister to Airborne Sports' trampoline-based-activities facility, which included a "ninja obstacle course." Fasel alleges that B.F. was injured on the obstacle course when a "tetherball" hit her head.[2] Fasel sued Airborne Sports for premises liability.

---

[1]For clarity and ease, we collectively refer to Appellees as Airborne Sports.

[2]Black ropes hung over the obstacle course with a ball affixed to each rope. Because the parties call the balls "tetherballs," we do too. But, for clarification, this term should not be confused with its customary meaning: (1) "a game played with a ball suspended by a string from an upright pole in which the object is to wrap the string around the pole by striking the ball in a direction opposite to that of one's opponent" and (2) "the ball used in this game." *See Tetherball*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/tetherball (last visited July 2, 2025). Airborne Sports asserted in its summary-judgment motion that each tetherball "is intended for guests to use solely for standing and maneuvering throughout the obstacle course, and for no other purpose." But the record does not contain any

Fasel's petition alleged that "B.F.'s sister let go of a tetherball[,] which swung back and hit B.F. on the forehead." Fasel further alleged that "[t]he tetherball had exposed screws where the rope connected to the ball . . . [and that] [t]here was no cover on the ball to protect users from the exposed screws." According to Fasel, "[w]hen the tetherball hit B.F. on the head, one of the exposed screws struck B.F. on the forehead." She "suffered a gash on her forehead," requiring medical attention and stitches.

Airborne Sports filed a combined no-evidence and traditional motion for summary judgment. Airborne Sports argued one no-evidence ground—that there was no evidence that a dangerous condition created an unreasonable risk of harm on its premises. It alternatively argued that it was entitled to a traditional summary judgment for either of two seemingly interrelated reasons: (1) B.F. was not injured by a dangerous condition that posed an unreasonable risk of harm on the premises because the tetherball was not a concealed feature, and (2) the tetherball feature was an open and obvious condition of the obstacle course and could not create an unreasonable risk of harm as a matter of law.

Fasel responded, and Airborne Sports replied. The trial court heard and granted Airborne Sports' motion without stating the grounds for its ruling. Fasel filed a new-

---

evidence describing how participants were supposed to use the obstacle-course tetherballs.

3

trial motion—essentially rearguing against the summary-judgment motion—which the trial court denied, and Fasel then appealed.

## II. Discussion

Fasel maintains that the trial court erred by granting summary judgment on his premises-liability claim. We disagree.

### A. Standard of Review

We review summary judgments de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When, as here, a party moves for summary judgment under both Rules 166a(c) and 166a(i) in a hybrid motion, we will first review the trial court's judgment under Rule 166a(i)'s standards. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under its standards, we need not analyze whether the appellee's summary-judgment proof satisfied Rule 166a(c). *Id.*

Under Rule 166a(i), after an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ.

P. 166a(i) & 1997 cmt.; *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## B. Applicable law

To succeed on a premises-liability claim, a plaintiff must prove that: (1) a condition of the premises created an unreasonable risk of harm to the invitee;[3] (2) the

---

[3]The duty a defendant owes in a premises-lability case depends on the plaintiff's legal status—whether the plaintiff is an invitee, a licensee, or a trespasser. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 474 (Tex. 2017). Here, it is undisputed that Fasel was an invitee on Airborne Sports' premises.

landowner knew or reasonably should have known of the condition; (3) the landowner failed to exercise ordinary care to protect the invitee from danger; and (4) such failure was a proximate cause of injury to the invitee. *See Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 883 (Tex. 2009). "[T]he landowner's premises-liability duty is to either make safe or warn invitees of concealed dangers of which the landowner is or should be aware but the invitee is not[.]" *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 201 (Tex. 2015). "The standard of conduct required of a premises occupier toward his invitees is the ordinary care that a reasonably prudent person would exercise under all the pertinent circumstances." *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex. 1983).

But "a landowner's duty to invitees is not absolute," and "[a] landowner 'is not an insurer of [a] visitor's safety.'" *Austin*, 465 S.W.3d at 203 (first citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 769 (Tex. 2010); then quoting Restatement (Second) of Torts § 344 cmt. f). For example, a condition that is open and obvious or known to the invitee in most cases does not "pose an unreasonable risk because the law presumes that invitees will take reasonable measures to protect themselves against known risks, which may include a decision not to accept the invitation to enter onto the landowner's premises." *See id.* Indeed, "a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee." *Id.* at 204.

The Texas Supreme Court has also made clear that "the standalone fact that a condition has caused an injury does not make it unreasonably dangerous." *Pay & Save, Inc. v. Canales*, 691 S.W.3d 499, 502 (Tex. 2024). Rather,

> [t]o raise a fact question on whether a common condition is unreasonably dangerous, a plaintiff must show more than a mere possibility of harm. At a minimum, [the law] require[s] sufficient evidence of prior accidents, injuries, complaints, reports, regulatory noncompliance, or some surrounding circumstance that transformed the condition into one measurably more likely to cause injury.

*Id.* at 503.

## C. The trial court did not err by granting summary judgment.

Considering the no-evidence summary judgment, the trial court's focus "shifted from the pleadings to the actual evidence or proof to assess whether there [was] a genuine need for a trial." *See Wood v. Wells*, No. 02-11-00087-CV, 2011 WL 5515483, at *5 (Tex. App.—Fort Worth Nov. 10, 2011, no pet.) (mem. op. on reh'g). We too examine the evidence before the trial court to see if Fasel met his burden. He did not.

### 1. The evidence

As part of its summary-judgment motion, Airborne Sports attached an unsworn declaration from its Manager Ethan Wrightman proving up an above-view "video of the incident" and a ground-level photograph supposedly depicting the

7

obstacle course on January 10, 2021.[4] The brief video footage generally shows what the course looked like and what happened.

Because no party provided any evidence describing the course, we will make a few observations about the video and provide a screenshot from that video footage for context:



[4]Airborne Sports also attached photographs of other playground equipment But the trial court orally sustained Fasel's objections to this evidence and did not consider it, so it is not before us. *See FieldTurf USA, Inc. v. Pleasant Grove Indep. Sch. Dist.*, 642 S.W.3d 829, 830–31 (Tex. 2022) (holding that "a trial court's on-the-record, oral ruling sustaining an objection to summary[-]judgment evidence suffices to strike the evidence from the summary[-]judgment record when the ruling is not reduced to a written order").

Along the course's entrance and right edge is an orange-padded-mat perimeter separating the course from the main floor. In contrast to the firm, black-carpeted main floor, the obstacle course's floor is cushioned and sinks when someone steps on it. A cone is visible on each edge near the corner.[5]

Two course sections are visible, and three sets of black arrows outlined by blue, yellow, or orange coloring are visible on the course's floor pointing right to left in both course sections. Over the course's right-side, black ropes hang, and most have an attached blue tetherball. Once users cross the course's right section, they reach an elevated horizontal orange pad, where they can then encounter higher hanging obstacles (ropes, balls, rings, or bowling-pin-shaped objects) that can be used to cross over to another elevated orange pad. It is unclear how far the course extends.

The video shows a young girl—B.F.'s sister—enter the obstacle course and almost immediately head for the course's right edge. As she continuously crosses the course, she extends her right arm, goes to her knees, and pushes or pulls a blue tetherball toward the right edge, before climbing on and over the edge. As she leaves the course, the rope-with-tetherball swings back.

---

[5]Airborne Sports' corporate representative testified that there were "multiple purposes" for using cones in the trampoline park: "The first main one was to direct traffic and the second one was to stop people from going somewhere where they're not supposed to be." But he did not know who or why someone had placed the two orange cones on the obstacle course on January 10.

B.F. is following closely behind, and soon after she steps on the course's soft flooring, she goes to her hands and knees in the path of the swinging tetherball. Because of the camera's angle, a black overhead beam obstructs a view of the moment of impact. But the tetherball and rope can be seen wobbling away from B.F. The first girl turns around to look at B.F. and then runs to get an adult, who comes to the obstacle course.[6]

---

[6]Both parties assert that the same course is depicted in the above-view video and the ground-level photo, but they differ visually:



The course widths are different, the floor markings do not correspond, and the padding's coloring is different (blue versus black vertical padding and orange versus gray horizontal padding). The United States Supreme Court has cautioned under federal summary-judgment practice that when a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Hadley v. Billiris*, No. 09-20-00197-CV, 2022 WL 2719636, at *5 (Tex. App.—Beaumont July 14, 2022, no pet.) (mem. op.) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007)). Here, both parties have taken the unexamined position that the ground-level photo shows the same course as the video. Because it does not, we have confined our observations to what we see in the video.

Although no party provided any evidence explaining what the tetherballs are made of, how hard or soft they are, or how they are affixed to the ropes, Airborne Sports' motion include an embedded screenshot of the following photograph that was not separately included as a summary-judgment exhibit:



Its motion states that Fasel produced the photograph in discovery and that it "represents a close-up of the 'tetherball' attached to the rope on the obstacle course." But summary-judgment motions are not evidence, *see, e.g.*, *Landmark Interest Corp. v. Texmore, Inc.*, No. 14-23-00889-CV, 2025 WL 454223, at *3 (Tex. App.—Houston [14th Dist.] Feb. 11, 2025, no pet. h.) (mem. op.); *Clayton v. Wisener*, 169 S.W.3d 682, 684 (Tex. App.—Tyler 2005, no pet.), and neither party offered any evidence of who took the photo, whether it is the actual tetherball that hit B.F. (instead of a representation of the actual tetherball), where (or whether) this tetherball can be

located in the video or the ground-level photograph purportedly showing the obstacle course, or any other fact concerning the photo.[7]

In response to Airborne Sports' motion, Fasel presented very little evidence. Neither he, B.F., her sister, nor any witness presented an affidavit or declaration about the course, the tetherball at issue, or what happened to B.F. Instead, Fasel offered excerpts from about a dozen pages from his and Airborne Sport's corporate representative's depositions, three photographs of B.F.'s injured and stitched-up forehead, part of B.F.'s medical records from a January 15 follow-up visit, and Airborne Sports' incident report.

That report documents that B.F. told Airborne Sports what happened to her: "[B.F.] was playing with the blue place holders at ninja and didn't pay attention and hit herself in the head. (Her words) (She was running chasing her sister and got hit with the ball.)" In another section, the report stated that "the ball hit her in the head."

Fasel testified that he did not personally witness the incident: "Q. Okay. So it's fair to say that you didn't see the injury occur on the day of the incident, correct? A. I did not see it personally, no."[8] In addition, Fasel testified that he did not know

---

[7]Fasel did not refer to this photo in his summary-judgment response or offer any explanatory evidence concerning the photo, but he asserts in his appellate brief that it "is a close-up photograph of the tetherball that struck B.F. in the forehead." No evidence supports that bare assertion.

[8]Airborne Sports included this excerpt in a reply brief that it filed more than 21 days before the summary-judgment hearing.

whether the first child on the obstacle course had grabbed the rope or pushed it out of the way. He admitted that by watching the video, he saw both girls running, even though "they shouldn't have been running." When asked, "Now, is it your understanding that that rope that moved is the one that injured [B.F.,]" Fasel replied, "I have no idea." Fasel was then asked, "How do you believe the injury occurred?" He answered, "She hit her head on one of the bolts."

Fasel also provided the following excerpt:

Q. Okay. Is it fair to say that, you know, you talked to your kids -- or, I guess, since you didn't see the injury occur, do you know how [B.F.] was injured?

A. Yeah. They were -- there was a bolt hanging out of one of the balls on the bottom of one of those things, which now they're not. They're tied rope, I guess.

Q. And whenever you say "the balls," are you talking about, like, the ropes with the balls at the end of them that were --

A. Yes.

B.F.'s medical-records excerpts indicate that she went to an emergency room on January 10 for a "[h]ead laceration." When she returned for suture removal, the doctor wrote, "[B.F. w]as at a trampoline park in Lewi[s]ville and hit her forehead on an exposed bolt per dad's report."

The deposition excerpts that Fasel included from Airborne Sports' representative established the following: Airborne Sports did not install the obstacle course; another company did. Airborne Sports had a maintenance man—Charlie—

13

who did any needed maintenance work on the course. Charlie checked the course for possible hazards "[a]bout four times a week." Airborne Sports was unaware of Charlie ever tightening any bolts within the obstacle course. Other than B.F., no one else had been injured within the obstacle course. And even though this was a first-time incident involving a tetherball and rope, Airborne Sports took the tetherballs off "right after the accident" because it "[did not] want it to happen again."

### 2. Analysis

Fasel presented no evidence of whether obstacle-course participants were supposed to run around the ropes or to stand on the balls while swinging over the floor—as if in the classic video game *Pitfall!*[9]—but Fasel argues that the real pitfall was a bolt protruding from the tetherball that struck B.F.[10] Indeed, Fasel's summary-judgment response asserted that the tetherballs were not unreasonably dangerous; rather, "the actual feature that presented the unreasonable risk of harm" was the "metal bolt sticking out of the [tether]ball."[11] We thus consider whether Fasel produced any evidence supporting this assertion. *See* Tex. R. Civ. P. 166a(i).

---

[9]*See Pitfall!* (Activision 1982).

[10]Fasel pleaded that an exposed screw protruded from the tetherball, but during summary judgment, both parties identified the fastener as a bolt. *See Bolt*, https://www.merriam-webster.com/dictionary/bolt (last visited July 2, 2025) ("a metal rod or pin for fastening objects together that usually has a head at one end and a screw thread at the other and is secured by a nut").

[11]Fasel reiterated, "Defendants attempt to expand the bolt to the ball as a whole, but the blue, plastic ball, itself, was not necessarily the cause of [B.F.'s] injuries.

14

The portion of Fasel's response to Airborne Sports' no-evidence ground—concerning whether evidence existed of a protruding-bolt condition creating an unreasonable risk of harm—consisted of five paragraphs, two of which cite no evidence. The first paragraph contained only legal argument, and the fifth paragraph merely concluded that "a fact issue is present."

In Fasel's second paragraph, he stated that "[Airborne Sports] installed and maintained the premises, including the tetherball where the bolt was sticking out of it." This paragraph cited no evidence and is not itself evidence. *See Hous. Livestock Show & Rodeo, Inc. v. Dolcefino Commc'ns, LLC*, 702 S.W.3d 675, 693–94 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (citing *Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (stating that "neither the motion for summary judgment, nor the response, even if sworn, is ever proper summary[-]judgment proof")). And as we pointed out above, Fasel produced evidence that Airborne Sports did not install the obstacle course, although its maintenance employee maintained it. Importantly, Fasel pointed to no evidence in Airborne Sports' deposition testimony that a bolt (or a screw, as he alleged in the petition) was sticking out of the ball that struck B.F.[12] The corporate representative's deposition testimony

Rather, it was the metal bolt sticking out of the ball that made contact with B.F.'s forehead, resulting in injury."

[12]Fasel argues on appeal that we should compare the photo of the tetherball embedded in Airborne Sports' motion to a photo of B.F.'s open wound. But as we have pointed out, Fasel (and Airborne Sports) did not provide an affidavit or

thus contained no evidence that a protruding bolt (a) existed and (b) constituted an unreasonable risk of injury to B.F.

Fasel's third paragraph cites Airborne Sports' incident report "as evidence that the bolt sticking out of the ball posed an unreasonable risk of harm to [B.F.]" But as we have quoted above, Airborne Sports' employee wrote that B.F. said in "[h]er words" that she "didn't pay attention and hit herself in the head . . . with the ball" and in another section reiterated that "the ball hit her in the head." Nowhere did the incident report mention a bolt sticking out of any tetherball, so it is no evidence that a protruding bolt constituted an unreasonable risk of harm to B.F.

Fasel's fourth paragraph quotes the part of his deposition testimony where he stated that "there was a bolt hanging out of one of the balls on the bottom of one of those things, which now they're not. They're tied rope, I guess." But Fasel testified that he did not personally see what happened, did not know whether B.F.'s sister had pushed or pulled the rope, "ha[d] no idea" if the moving rope was what had injured B.F., and could testify only to what he believed or guessed had happened. Other than Fasel's subjective testimony—premised on how he "believe[d] the injury occurred" and his "guess"—which is not legally sufficient evidence, Fasel offered no evidence

_____

declaration to provide any context about what is shown in the embedded photo. Aside from the fact that it does not show a "bolt hanging" below it (as Fasel speculated), there is no evidence that that was even the tetherball that struck B.F., so we cannot simply compare it to B.F.'s post-injury photo to infer or conclude that a bolt protruding from a tetherball struck B.F. or posed an unreasonable risk.

16

that a protruding bolt on a tetherball was present or struck B.F.[13] *See Wal-Mart Store, Inc. v. Gonzalez*, 968 S.W.2d 934, 937–38 (Tex. 1998) (concluding in a premises-liability case that testimony that dropped macaroni salad "seemed like it had been there awhile" was speculative and no evidence when no one had seen the macaroni salad on the floor before the accident or had any personal knowledge about its condition); *1701 Commerce Acquisition, LLC v. Macquarie US Trading, LLC*, No. 02-21-00333-CV, 2022 WL 3904976, at *11 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) (mem. op.) ("A person's subjective beliefs are not competent summary-judgment evidence.").

The fact that B.F. was injured by a swinging tetherball obstacle on an obstacle course composed of hanging tetherballs is not, by itself, proof of an unreasonably dangerous condition. In fact, Fasel introduced evidence that no other person had ever been injured on the obstacle course or in an incident like B.F.'s. *See Pay & Save, Inc.*, 691 S.W.3d at 503 (stating a plaintiff must prove that a condition is "one measurably more likely to cause injury," including by evidencing prior accidents). "As the Texas Supreme Court has stated, 'the fact an accident happens is no evidence that there was an unreasonable risk of such an occurrence; because almost any activity involves some risk of harm.'" *Shoemaker v. Kohl's Dep't Stores, Inc.*, No. 05-16-00273-CV,

---

[13]In his brief, Fasel points to B.F.'s medical records indicating that he told the doctor that B.F. "hit her head on an exposed bolt." But Fasel's deposition testimony shows that he did not see what happened; thus, what he told the doctor was likewise premised on his subjective belief and is not evidence that a protruding or hanging bolt struck B.F.

17

2017 WL 1192797, at *3 (Tex. App.—Dallas Mar. 31, 2017, no pet.) (mem. op.) (quoting *Thoreson v. Thompson*, 431 S.W.2d 341, 344 (Tex. 1968)).

By examining Fasel's evidence provided in response to the no-evidence motion, we hold that he did not raise a genuine issue of material fact that a protruding or hanging bolt on Airborne Sports' premises created an unreasonable risk of harm to B.F. and further hold that the trial court did not err by granting Airborne Sports' no-evidence summary-judgment ground. We overrule Fasel's first issue.

**D. The trial court did not err by denying Fasel's new-trial motion.**

In his third issue, Fasel argues that the trial court erred by denying his motion for new trial. "After a court grants a summary[-]judgment motion, the court generally has no obligation to consider further motions on the issues adjudicated by the summary judgment." *Corley v. Hendricks*, No. 02-16-00293-CV, 2017 WL 1536210, at *3 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (mem. op.) (quoting *Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (cleaned up)). We review for an abuse of discretion a trial court's denial of a new-trial motion after granting summary judgment. *Id.*; *Macy*, 294 S.W.3d at 651. A trial court does not abuse its discretion in denying a new-trial motion "if the movant cites no additional evidence beyond [that] available to him" when the summary judgment was granted. *See Tex. Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 851 (Tex. App.—Eastland 2022, no pet.); *Macy*, 294 S.W.3d at 651.

Here, Fasel argues that "the only evidence outside the record that [he] arguably sought to introduce in his motion for new trial was counsels' arguments at the hearing on Airborne Sports' motions for summary judgment." Rule 166a does not permit oral testimony at a summary-judgment hearing, *see* Tex. R. Civ. P. 166a(c), and counsels' arguments at the summary-judgment hearing were not competent summary-judgment evidence, *see Dowell v. Theken Spine, LLC*, No. 14-07-00887-CV, 2009 WL 1677844, at *3 (Tex. App.—Houston [14th Dist.] June 2, 2009, no pet.) (mem. op.). Accordingly, we hold that the trial court did not abuse its discretion by denying Fasel's new-trial motion. We overrule his third issue.

## III. Conclusion

Having overruled Fasel's first and third issues,[14] we affirm the trial court's "Order Granting Defendant's No-Evidence and Traditional Motion for Summary Judgment."

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: July 3, 2025

---

[14]Our overruling Fasel's first issue supports affirming the trial court's summary-judgment order, so we need not reach his second issue. *See* Tex. R. App. P. 47.1.